# HAMMOND v. INDUSTRIAL COMMISSION et al.

No. 5366.   Decided July 16, 1934.   (34 P. [2d] 687.)

*J. G. Jeppson,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *W. A. Fraser,* Asst. City Atty., of Salt Lake City, for defendants.

STRAUP, Chief Justice.

An application by Hannah Giese Hammond on her behalf and of a minor son, Clarence E. Hammond, under our Workmen's Compensation Act (Comp. Laws 1917, § 3061 et seq., as amended), was filed before the Industrial Commission seeking compensation for the death of Harry Andrew Hammond, the husband and father of the applicants. Among other things it was alleged that the deceased at the time of the alleged injury and death was in the employ of Salt Lake City, and that the death was caused by reason of an accident arising out of or in the course of his employment. The employment was admitted, but it was denied by the city that the injury or death was caused by reason of or on account of any accident arising out of or in the course of the employment.

The case was heard before the commission. The only findings made by it pertinent to the review are that:

"It is alleged by the applicant that her husband, Harry A. Hammond, on July 14th, 1932, while employed by Salt Lake City Corporation, and while engaged in cleaning reservoir and stream in City Creek Canyon, by reason of excessive work, severe strain, lifting and over-exercise, his heart muscles were strained, causing a cardiac collapse, which she alleges resulted in death on July 16th, 1932.

"All the evidence introduced as to whether or not the decedent was injured by accident is hearsay.

"The applicant has failed to sustain by competent evidence her burden of proof to show that the death of her husband, Harry A. Hammond, was caused by an accident arising out of or in the course of his employment while employed by Salt Lake City Corporation."

The application was therefore dismissed, and compensation denied, from which the applicants have prosecuted this review upon the record certified to us of all the evidence adduced and proceedings had before the commission.

On the record we think the evidence required an award. The claim for compensation was based on a strain or over-exertion of the deceased in the course of his employment which resulted in an acute dilatation or collapse of the heart, causing death in less than two days thereafter. ∎ The cause of death, as stated in the death certificate, was "cardiac collapse, contributory cause, severe straining and lifting." The commission disposed of the case by a conclusion of law that "all the evidence introduced as to whether or not the deceased was injured by accident is hearsay," and that the applicant failed to sustain the burden of proof by competent evidence that the death was caused by accident arising out of the course of the deceased's employment. Such finding or conclusion on this review is challenged by the applicants and petitioners, who contend that upon the undisputed competent evidence they were entitled to an award. To get a correct understanding of the situation requires a rather detailed reference to the evidence and particularly to the facts and circumstances bearing on the claimed over-

exertion and the effect thereof, statements or declarations made by the deceased to the physician whom he visited for medical aid and treatment, and to statements and declarations made by him to his wife, which statements and declarations are asserted by the city and the commission to be mere hearsay, and thus on this review should be excluded from consideration as was done by the commission.

The deceased was 51 years of age. He had been in the employ of the city as a watchman and patrolman looking after reservoirs and water supplies of the city for nine or ten years, first at Brighton at the head of what is known as Big Cottonwood Canyon and then for about three years at what is known as City Creek Canyon, where the deceased was employed at the time of his death. By the record he sometimes is referred to as a "tank man." Among other duties he was required to look after and clean reservoirs, weirs, and screens, etc, and patrol a portion of the canyon looking after the water supply of the city. He and his wife lived up the canyon in a house opposite or nearby the reservoir, weirs, and screens where the deceased and two or three other men were at work on July 14. That the deceased was in the employ of the city and that the doing of the work in which he was engaged on that day and prior thereto, and what he did on the following day, the 15th (he died about 2 o'clock on the morning of the 16th), was in the course of his employment, is not disputed. All that at the hearing before the commission was admitted.

The wife, in substance, testified:

That the deceased prior to the claimed exertion on the 14th was always in good health, ate and slept well, and was "as healthy as he could be." That on July 14th her husband and three other men started to clean out the reservoir and weirs and screens near her house. There were about six feet of mud, gravel, and other debris in the reservoir, and that she saw and watched the men doing the work and some of the time was outside and nearby, within fifteen or twenty feet,

where the work was being done. The men had on rubber boots. That the valves and gate were hard to open, were soaked with mud and lime, and that they were required to pry them open, and that her husband had to jump in and out of the reservoir and go from one weir to another, and that when the water was turned out he was required to go to a weir below, and, when the water was at a level, to go back and shut the gates and fill the tank again. When the water was let out of the reservoir the men were required to shovel the mud and gravel out of it and in doing so had to work "as hard as they could" before the water was again let in. That the first time the men tried to open the gate they were unable to do so. That it was heavy and stopped with lime, and that her husband and other men tried to open the gate by means of the wheel, but were unable to do so, and that "they worked real hard at it." That her husband was continually pulling the valves. Being unable to open the gate in that manner, they then got a bar. That her husband tried to pry the gate open with it, and was down below stooping over, punching, and prying and lifting with the bar. That then they put the bar in the wheel and her husband and two other men by that means pried the gate loose, and that during that time she was present and saw what they did.

Shortly thereafter her husband came into the house for lunch; his shirt and underwear were soaking wet with perspiration. That his face and lips were a little blue. That he did not look right, and stated that when he pried and pulled in opening the gate he felt a pain strike him on the chest, and that every time he jumped out and down to the lower tank he was in intense pain. That he rested a little while and then went back to work and quit at about 4 o'clock. He did not eat much of anything at supper. That he went to bed a little early. That he did not sleep much, tossed about, and "pawed" with his hands most of the time (raising his arms up and down in a pawing fashion) and complained

of pain in the chest and in the pit of the stomach. The next morning, which was on the 15th, he felt worse. In the forenoon he undertook to cut some weeds nearby. The witness saw him cutting them. While cutting the weeds he raised up, stating he "got a pain and was short of breath and was perspiring all the time." He went in the house and rested. He did not eat anything at noon, and in the afternoon he stated that he would "patrol down the canyon and maybe the pain might pass off." He went down about halfway and came back and stated "the pain knocked me down on the ground," and that he had to stay a little while before he could get back. When he got back, "he looked terrible, his color looked kind of bluish and the lips were all blue," and that he was short of breath and in pain. At 3 o'clock she by telephone called Dr. Andersen down town, and at 4 o'clock she took her husband to the doctor's office where the doctor examined him, gave him a prescription, and sent him home to bed. She prepared supper for her husband that evening, but he did not eat anything. He retired rather early, but slept little, was short of breath, and pawed all the time with his hands, complained of increasing pain, and, though the windows and doors were all open, he complained of want of air, was short of and gasped for breath, and died that night at about 2 o'clock in the morning. That prior to her husband engaging in the work at the reservoir he was not short of breath. That, when he was at Brighton where the altitude was high, he went from lake to lake in looking after the water supply without any difficulty and without being short of breath, and that he was not short of breath or complained of any ailment whatever in doing his work in City Creek Canyon. She was asked and she answered:

"Q. Dou you know whether he suffered from shortness of breath? A. No.

"Q. Or fatigue on these walks (when he was walking up at Brighton) I am speaking of? A. No, never been bothered with that.

"Q. He had a heart murmur sometime before his death did he not? A. Yes.

"Q. Did that ever distress him in any way?  A. No, I never knew he had such a thing, because he was always a healthy man, and it was a shock to me he went that way.

"Q. You didn't know he had such distress?  A. No."

(When the doctor examined him he found some murmur at the apex of the heart to which reference presently will be made.)

One of the workmen who worked with the deceased at the reservoir on the 14th, in substance, testified:

There were between five and six feet of dirt in the bottom of the reservoir which was all moved out that day by four men including the deceased; that in doing that there were about fourteen-minute intervals that the water was passing through the weir; that they had to lower the valves and let the small weir fill up and keep the pipes from getting air in them and that letting air in the mains was liable to break them; that they were required to raise the gate and get in and clean the tanks and then let them fill again which took about fifteen minutes; that they had difficulty in opening the washout and cleaning out the valve in the extreme bottom of the reservoir; that the valve slides were corroded and could not be opened by hand; that the deceased then got a bar which he put in the wheel and opened the gate, pushing and prying on the bar; that doing that was hard work, but after the first time the gate was opened it then could be opened and closed by hand at the wheel; that it was hard work to start it; one of the men most of the time was at the other weir; "all three of us, including the deceased, tried to open the gate but we were unable to budge it and then the deceased got the bar; his shirt was completely soaked with perspiration; in the evening we were all pretty well fagged out"; a Mr. Young from the water department drove up and asked how we were getting along when the deceased replied, "Pretty good, but it's one hell of a job." The chairman of the commission asked the witness if he saw anything to indicate that the deceased had hurt himself, to which the

witness answered that he could not tell "because I don't know"; that the deceased made no complaint and made no remarks of feeling bad; that he did not say anything; that he seemed to be pretty good, just about the same as when they started in the morning. The chairman of the commission further asked the witness, "When you quit work what did he (deceased) say? A. He said it was a hard job. He says, 'We done certainly lots of hard work in the place today,' but he made no complaints of any kind that I heard, but he stated, 'It was an awfully hard job, a big job.' "

Dr. Andersen was also called as a witness on behalf of the applicants. When he started to give his testimony, counsel for the city stated his "qualifications were admitted," but further stated they did not know whether he "specilizes as an expert in heart trouble." The doctor then was asked whether he "specialied in heart trouble." He answered he did not; that he was a graduate of the University of Maryland, spent one year as an interne, and since 1912 practiced his profession in Wyoming, at Brigham City, and at Salt Lake City, Utah, a period of twenty years. When asked if he had "extensive practice pertaining to heart cases," he answered he had what any other man has had with a number of years of practice; that such cases fell within their general practice; that he treated cases of cardiac dilatation, coronary sclerosis, coronary occlusion, angina pectoris, and was familiar with all those, and felt competent to testify with respect to them. No contention was made by the city or by any one to the contrary. The doctor then, in substance, testified:

He saw the deceased at his office about 4 o'clock on the afternoon of the 15th. He complained of severe pain under the breastbone, and pointed to his stomach immediately under the lower part of the bone which "we call the ensiform cartilage." He felt terribly weak and short of breath. He stated that in raising a screen or gate at the reservoir in City Creek Canyon the gate was stuck, and he went to raise

it and was suddenly seized with pain; that it was necessary for him to jump in and out of the reservoir and shovel gravel or whatever happened to be responsible for the screens being stuck; that the pain continued, and that he attempted to do his work more or less all day, but that the pain never left him; that he would feel a little relieved and the pain would come back as severe as at first; the following morning he felt very little, if any, improvement; that he proceeded to cut weeds near the house and patrolled the canyon; that he was taken with pains much more severe than the day before; that while patrolling the canyon he was taken with a pain sufficient to knock him down, but that he found his way to the house; was weak, perspiring freely and short of breath. When he came to the office he looked almost too sick to make much of an examination, but "I had him lie down, removed his shirt, examined his chest. He pointed to the point where the pain first originated, and I found he had no soreness or masses. I examined his chest with a stethoscope and found a heart that was sluggish in action. The sounds were distinct. Didn't seem to have the strong impulse that is usually found in a normally good heart. His pulse was very poor in quality, but no irregularity in the pulse was heard. His blood pressure was 120 over 90, that is systolic pressure over the diastolic pressure. His skin was clammy, and his lips and finger nails were a little cyanotic. I sent him home to bed, and told him to keep entirely off his feet. He had a faint, perhaps a mitral systolic murmur at the apex of the heart. The opinion that I formed at that time was that he had strained his heart from prolonged and continued effort"; that he had what is called "a heart collapse" of "an acute dilatation"; that he found no degeneration or evidence of myocarditis.

Thereupon counsel for the applicants submitted to the doctor a rather long hypothetical question consisting of about four pages of typewriting, which embodied the substance of the testimony of the wife and of the workman and the

matters and things discovered and testified to by the doctor, and upon such hypothetical question the doctor answered that his opinion was that the deceased died as a result of "acute cardiac collapse as a result of continued and severe straining, and accumulation." The doctor further testified that:

In a cardiac dilatation the chambers of the heart become distended with blood and usually the auricles of the two upper chambers force the blood so fast into the two lower chambers, the ventricles, that they become distended, and that the heart muscle not being given a sufficiency to accommodate itself to this sudden pouring of blood into these chambers, and are placed under a tremendous strain, and with the enormous increase of tension within those chambers trying to expel the blood from them into the general circulation, the heart muscles weaken and stop; that the dilatation may be very acute with sudden death, or death shortly after, or it may be of a less severe nature and death follow in the course of a number of hours, or maybe several days. In some cases the heart may recover sufficiently that the patient may live for sometime, and in other cases he may die in the course of a few hours. If the deceased could have had sufficient rest immediately upon notice of the first disturbance, the outcome might have been different, provided his heart muscles would have had sufficient reserve power to carry it on; the fact that he continued work, there was one injury added upon another causing strain and did more damage to the heart muscle that made it impossible for that muscle to recover from the initial injury. From the history of the case the deceased never had previous trouble with his heart. The man might have had some physical weakness which the doctor was not familiar with, but the fact that it came on as a result of violent exertion, which can be placed at a certain time, leaves no doubt in the doctor's mind as to the cause of death by injury, "death attributable to the exertion." With respect to the murmur, the doctor stated that a murmur is

usually faint at that particular place (apex of the heart) during acute dilatation.

"Q. It may not have been there before you examined him? A. It might not have been.

"Q. But the fact is that he did have a murmur? A. He might have had.

"Q. Would that change your opinion, the fact he had a murmur prior to this work that was strenuous? A. It would not for the reason that many men doing military service during the late war went through that war with mitral murmurs. Many people have murmurs and are not aware of it until they are examined. The mitral murmur is one of the less dangerous. The aorta would be the most. Triceps stenosis the second, and mitral insufficiency the next."

In that the witness stated he was quoting Ostler. The doctor further stated that there were cases where persons died suddenly from "thrombosis in the coronary arteries," sometimes without strain or exertion but where there is some ailment of the heart, but that was not the case as to the condition of the deceased, and that what caused the cardiac collapse was violent exertion exercised by him.

The only witness called by the city was Dr. Viko who, as he stated:

Graduated at Harvard Medical in 1920 and that he had special training in heart diseases and "about 25% of my practice is devoted to heart diseases," and then stated the special training and experience he had had in "heart cases." He then was asked by counsel for the city whether he had "heard the testimony in this case." He stated that he came in late and had not, but heard the testimony of Dr. Andersen and heard the hypothetical question propounded to him. Then he was asked:

"Q. You are familiar with the facts read by him of the death of Mr. Hammond? A. I am familiar with the facts as stated in the hypothetical question and the information that I secured personally after his death.

"Q. You went up the canyon—up to the high line station after Mr. Hammond died? A. I did.

"Q. On the morning of the 16th? A. I did.

"Q. Did you get some history from Mrs. Hammond at that time? A. I did.

"Q. Did you get any history from Dr. Callister? A. When we were going up Dr. Callister was coming down. However, I had seen Mrs. Hammond, and she told us some of it."

### Then this question was propounded to the doctor:

"Q. Doctor, taking into account all you have heard, the hypothetical question and all the evidence which has been submitted leading up to the death of Mr. Hammond, can you state to the Commission what your opinion is relative to his death? I will make it a very broad question."

### The doctor answered that:

"The history given as to the symptoms preceding and at the time of the death are quite typical of death due to coronary arterial occlusion. Coronary arterial occlusion is the final closing or plugging up of one or more coronary arteries of the heart. It is based in about 95 per cent of the cases on hardening of the coronary arteries which is a slowly developing process over a period of months or years, and final occlusion of the artery, which shows the clinical picture described here. It may occur or be precipitated by, or contributed to by physical strain, mental strain, or accident, or may occur without such physical strain, or mental strain or accident. It may occur during sleep."

### Thereupon the chairman of the commission asked the doctor the question:

"So if it is established in this case that this man did have a strain, and at the time of his over-exertion he felt a pain within the region of the heart, then would you say that would be a contributing cause? A. I would say that the final strain might be a contributing cause but not the primary cause. The primary cause is the hardening of the arteries."

### In response to further questions asked by counsel for the applicant, the doctor stated that coronary occlusion

"is usually based upon the result of hardening of the arteries. Q. You don't know that that was the case here? A. It does not occur except—either that or one of two causes, one is syphilis and the other is a blood clot coming from some other course in the body."

Further questions were then being propounded to the doctor when the chairman of the commission stated to counsel for the applicants:

"Do you understand Mr. Jeppson that under our law if it is established that an accident aggravates a pre-existing condition that it is compensable?

"Mr. Jeppson: Yes.

"Com. Knerr: The doctor has already stated that. Why this extended examination?

"Mr. Jeppson: That is all."

The forgoing in substance is all the testimony in the case. Now as to the admissibility of the statements and declarations of the deceased made to Dr. Andersen and ■ to the deceased's wife. The general rule is, and I think it is everyday's practice, and as stated in the case of *Northern Pac. R. Co.* v. *Urlin*, 158 U. S. 271, 15 S. Ct. 840, 842, 39 L. Ed. 977, that:

"The declarations of a party himself, to whomsoever made, are competent evidence, when confined strictly to such complaints, expressions, and exclamations as furnish evidence of a present, existing pain or malady, to prove his condition, ills, pains, and symptoms, whether arising from sickness, or from an injury by accident or violence. If made to a medical attendant, they are of more weight than if made to another person."

In 3 Jones' Commentaries on Evid. (2d Ed.) 2234, the author says:

"Where it appears that the physician testifying was called by the injured person in his ordinary professional capacity and for purposes of securing relief from pain and for medical treatment, and there are no circumstances casting suspicion on the genuineness of the utterance, all statements of symptoms and sufferings, whether past or present, and though involving statements as to the nature of the accident, if necessary to diagnosis by the physician, may be testified to by him. On the other hand, where a physician examines an injured person for the express purpose of testifying as to his physical condition, even declarations of present pain made by the patient to the physician have been held inadmissible."

The proposition is well put in the case of *Coghill* v. *Quincy, O. & K. C. Ry. Co.* (Mo. App.) 206 S. W. 912, 913, that:

"It is a familiar rule that, where a physician is treating a patient, inquiry of such patient is a necessity to intelligent treatment. The wholly unreasonable supposition that the patient, in such circumstances, would give him false information, relieves the communication from the objection ordinarily attaching to hearsay evidence. But it is said that, if the attendance of the physician is for the purpose of preparing himself as a witness in a case then pending, or expecting to arise, different considerations enter, for, in that instance, there will stand a temptation to falsity, or at least magnify, the true condition."

The admissibility of evidence of declarations of present pain, suffering, or symptoms is not dependent upon their having been made to or in the presence of medical attendants. 8 Ency. of Evid. 576. If the declarations or statements are descriptive of or characterize a present ▮▮▮ pain, suffering, or symptoms, they are admissible to whomsoever made. Various reasons have been stated for the admissibility of such evidence. By some texts and by some judicial decisions the admissibility is put on the ground or theory of res gestae. But that does not necessarily mean res gestae to the happening of the accident or contemporaneous with the infliction of the injury. Declarations made at such time and which tend to explain, illustrate, or characterize the transaction and which are a part thereof are admissible under the res gestae rule, though they may not be declarations of pain or suffering. *Cromeenes* v. *San Pedro, L. A. & S. L. R. Co.*, 37 Utah 475, 109 P. 10, Ann. Cas. 1912C, 307. Declarations or statements descriptive of and which characterize a mental or physical condition of present pain or suffering or symptoms are admissible, though made after the injury was inflicted. They, of course, must characterize or be expressive of a present mental or physical condition of pain or suffering of symptom, res gestae to such condition, and which prompted or induced the declarations. Other authorities put the admissibility on

the ground, not as an exception to the general hearsay rule but as competent evidence of the mental or physical condition and "as verbal acts rather than hearsay" (8 Ency. of Evid., 575) and, as well put by Mr. Justice Swayne in the case of *Travelers' Insurance Co.* v. *Mosley,* 8 Wall. 397, 404, 19 L. Ed. 437, that:

"Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent explanatory or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury."

Tested by these principles, the declarations and statements, in the main, made by the deceased to Dr. Andersen were admissible. Certainly the statements made by the deceased as to pain and suffering and the character and extent thereof, when first experienced, the extent of exertions exercised by him, the nature and character of the work in such particular as performed by him, etc., all tended to show the extent of the exertion, and were all necessary to enable the physician to properly diagnose the condition of the deceased and to treat him. The statement that the work was done at a particular reservoir or place in City Creek Canyon operated or controlled by the city may be open to objection, and may properly be excluded. That is illustrated by the case of *North American Acc. Ins. Co.* v. *Hill's Adm'x,* 182 Ky. 125, 206 S. W. 170. That case was one brought to recover damages on an accident policy restricted to injuries sustained by traveling on a passenger train. The physician consulted by the plaintiff was permitted to testify that the plaintiff stated to him that, while he was boarding a train, it started up suddenly, throwing him violently, and that he fell on a grip carried by him or that the grip fell on

him, thus bringing the case directly within the terms of the policy. The court held that, while the physician could testify that the plaintiff stated to him that he sustained an accident wherein he fell on a grip or that the grip fell on him and the part of the body affected, together with the symptoms following, but, to enable the physician to properly treat the plaintiff, it was not essential to mention the place where the accident occurred.

Here the facts as to what the work was on the 14th and 15th of July, the nature and character thereof, and the place where it was performed, do not rest on declarations or statements of the deceased. All that was indisputably shown by the testimony of the wife who was present and nearby and saw the work performed by the deceased and other workmen and the exertions exercised by him, and by the testimony of one of the workmen who, with the deceased, was engaged at the work. The statement or declaration of the deceased made to the doctor, that he the next day fell to the ground while cutting weeds, was proper, for such statement tended to describe the nature and extent of the pain, and was but a way of giving the doctor the information or knowledge of the severity of the pain. So, too, the statement of the deceased to the doctor was competent that he jumped in and out of a reservoir and shoveled gravel, etc., for that too had a bearing as to the extent and character of the exertion exercised by the deceased, especially when coupled with the weakened condition and shortness of breath and the cyanotic condition of his lips and finger nails, in which condition the doctor found him, and had a bearing in determining the cause thereof.

So, too, in the main, the declarations and statements made by the deceased to his wife were also admissible. Certainly the testimony of the wife as to the condition in which the deceased appeared when he came into the house for lunch, that his face and lips were a little blue, that he did not look right, that his shirt and underwear were soaking wet with perspiration and the complaints of

plain then made by him, that he did not sleep well, pawed with his hands, the condition he was in the next morning, the complaints of pain made by him the next day, and the condition which he was in during the next day and the night when he died, were all competent. Her testimony as to the character of the work and the manner in which it was done at the reservoir by the deceased and as testified to by her in no sense was hearsay. It was direct evidence of what she herself saw and observed. Nor was the statement made by him in connection with his appearance as described by the wife and of complaints made by him, that when he pried and pulled in opening the gate he felt a pain in the chest, open to objection, for again such statement but characterized and was descriptive of present pain complained of by the deceased and was expressive of natural reflexes of what might be impossible to show by other testimony. *Travelers' Insurance Co.* v. *Mosley,* supra. To limit testimony of mere statements or declarations of pain or suffering, stripped of expressions of natural reflexes as a part thereof and prompted and induced thereby, is, to a large extent, to deny the efficacy of the rule itself. So too, was the statement of the deceased competent when he returned from patrolling the canyon looking "terrible, his color kind of bluish and his lips all blue," that the "pain knocked him down on the ground," for again such statement was merely descriptive of the character of his then condition and of the severity of present pain suffered by him.

Thus, what on the whole record and upon the undisputed competent evidence have we? That strained effort or overexertion may cause an accidental injury or death for which compensation under our Industrial Act may be awarded may not longer be doubted, and here is not controverted. That the deceased in the course of his employment at ▮▮▮ the reservoir engaged in rather strenuous efforts and overexertion is sufficiently and indisputably shown. That does not rest on hearsay. It was established by the testimony of those having knowledge of the character and nature

of the work performed. That the deceased from the strained efforts or exertion did not immediately collapse at the reservoir and while in action or that he then made no outcry or complaint of pain is not the controlling factor. It is enough if the collapse is reasonably and fairly attributable thereto. Nor is it essential that such consequence be shown by direct or positive testimony. It may equally well be shown by facts and circumstances which fairly and reasonably point to such result and to the exclusion of any contrary result equally deducible from the proven facts and circumstances. Upon the whole record, the only reasonable or permissible inference is that the heart collapse of the deceased was occasioned by strained efforts and exertions exerted by him in the performance of his work at the reservoir. No finding is made by the commission to the contrary, nor is there any finding made as to the cause of death. All that the commission found was that "all the evidence introduced as to whether or not the deceased was injured by accident is hearsay," and that the applicant failed to sustain the burden of proof "by competent evidence" that death was caused by accident arising out of or in the course of the deceased's employment. There is most direct and positive testimony that he died from heart collapse caused by strained efforts and overexertions at the reservoir in the course of his employment. On the record, we think no other conclusion is reasonable or permissible. Prior to the deceased engaging in the work at the reservoir on July 14, he indisputably was in good health. The kind and character of the work that he did at the reservoir is not disputed. The only witness called by the city was Dr. Viko. As is seen, the opinion expressed by him that the deceased died from "coronary arterial occlusion" was based only upon a portion of the testimony heard by him and upon the hypothetical question submitted to him, and upon what he had heard up the canyon the morning after the death from Mrs. Hammond and another doctor. What information he acquired in such respect was not disclosed. He based his opinion upon the ground

that, in 95 per cent of the cases of death from coronary arterial occlusion, death resulted from hardening of the arteries, and in the other 5 per cent from syphilis. There was no evidence whatever that the deceased suffered from hardening of the arteries or that he ever had syphilis. However, the doctor also stated that coronary arterial occlusion "may occur or be precipitated by or contributed to by a physical strain, mental strain or accident," or it may occur without such strain or an accident; that "it may occur during sleep." But there is no evidence that death occurred without a strain or merely during sleep. To say that the death resulted from coronary arterial occlusion without a strain or overexertion or independently thereof is mere conjecture, and not based on any of the facts or circumstances attending the case. And let it again be noticed the commission did not find that death was due to such a cause; and, if the commission had so found, the finding would rest upon mere conjecture.

As is seen, the only real issue in the case and about all the evidence given was addressed to the cause of death, and that no finding whatever was made as to such issue, the commission contenting itself merely by saying that the evidence introduced with respect thereto was hearsay and that the applicants "by competent evidence" failed to sustain the burden of proof that the death was caused by an accident arising out of or in the course of employment. It is quite evident that about all the evidence adduced on behalf of the applicants was rejected by the commission on a misconception of the law as to its competency and on a mistaken motion that the evidence so adduced was hearsay and incompetent. Because thereof, and not considering, weighing, and applying the evidence, but rejecting it, an award was denied.

Thus the order denying compensation is annulled and vacated, and the cause remanded for further proceedings in accordance with the views herein expressed. The petitioners are given costs against the city but not costs against the commission.

FOLLAND and EPHRAIM HANSON, JJ., concur.

MOFFAT, Justice.

I am of the opinion, however, that this case in effect overrules the case of *Bamberger Coal Co.* v. *Ind. Comm.*, 66 Utah 203, 240 P. 1103.

ELIAS HANSEN, Justice (dissenting).

In my opinion the evidence in this case is not such as to require as a matter of law an award of compensation. An injury or death to be compensable under our Industrial Act must result from an accident. The time when the deceased first suffered a heart attack is not of controlling importance. He may have experienced his first attack while he was engaged in working at the weir, but such fact alone would not entitle his dependents to compensation. And likewise he may not have suffered an attack until after he had finished his work; yet such fact alone would not preclude his dependents from their right to compensation. And, even though the deceased sustained an injury resulting in death while he was engaged in and as the result of his work for the city, such fact alone would not entitle his dependents to compensation. To be compensable, an injury or the death resulting therefrom must be the result of an accident. This court in the case of *Tintic Milling Co.* v. *Ind. Comm.*, 60 Utah 14, 206 P. 278, 280, 23 A. L. R. 325, quoted with approval the following from Honnold Workmen's Compensation, vol. 1, pp. 274-278:

"The word 'accident' refers to the cause of the injury, and it is here used in its ordinary and popular sense, as denoting an unlooked for mishap, or an untoward event, which is not expected or designed by the workman himself, as a physiological injury as a result of the work he is engaged in, an unusual effect of a known cause, a casualty. It implies that there was an external act or occurrence which caused the injury or death. It contemplates an event not within one's foresight and expectation resulting in a mishap causing injury to the employee."

Further on in the same opinion it is said:

"What is termed an accident must be something out of the ordinary, unexpected, and definitely located as to time and place. If the

88

injury is incurred gradually in the course of the employment, and because thereof, and there is no specific event or occurrence known as the starting point, it is held to be an occupational disease, and not an injury resulting from accident."

The doctrine announced in the *Tintic Milling Co. Case,* supra, was approved in the case of *Cherdron Const. Co.* v. *Simpkins,* 61 Utah 493, 214 P. 593.

The facts which are of controlling importance in the instant case are quite similar to the facts in the case of *Bamberger Coal Co.* v. *Ind. Comm.,* 66 Utah 203, 240 P. 1103. The facts in that case are thus stated in the opinion:

"On the morning of January 31, 1925, Mr. Tullgren applied to the coal company for employment. Under verbal agreement with the foreman of the yard of the coal company he began unloading a car of coal on that morning. The compensation was 15 cents per ton. The coal was to be unloaded at a designated place, and the work was to be completed within 48 hours. The deceased continued at the work of unloading the coal until the noon hour. Nothing appears in the record as to what took place during that time, except that one witness testified that he observed the deceased at his work, and some remark was made to the effect that 'this man will give out at the rate he is going on that coal.' At the noon hour the deceased came into the office of the coal company in the yard where he had been unloading the coal, and complained of pain in his chest. He asked some one there for a drink of water. He was told there was a hydrant outside. He got up and opened the door, when he remarked, 'I can't get out there,' and returned and sat down. Some one present gave him a drink of water. He took a couple of sips of water, kept on moaning and groaning, and held his chest, and he asked, 'Will some one take me home? I am sick.' He also said, 'Will some one take me to the drug store.' One of the teamsters or truckmen present took him home. On his way home Mr. Tullgren said, 'I can't make it.' He remarked on the way home that he had been out of work for about two months, and thought he overdid himself that forenoon. Mr. Tullgren died within the next 24 hours. A doctor was called, and said, upon examination, that he went over the deceased's chest, but found nothing in the lungs, but the heart was very much enlarged, and was not emptying itself. It was dilated. He described it as what is termed 'heart block.' The doctor gave it as his opinion that the deceased had a chronic 'myocarditis, a chronic inflamation of the heart muscles.' Commissioner Knerr asked the physician this question:

" 'You think then it was by reason of unloading this car of coal, big lumps most of it, was the exciting cause of his death? Answer: No; it was the immediate cause.' "

Upon the foregoing facts the Industrial Commission awarded the widow of Mr. Tullgren compensation. This court by a unanimous opinion annulled the award. In the course of the opinion it is said:

"Applying the facts disclosed by the record to the principles announced in the foregoing cases (*Tintic Milling Co.* v. *Ind. Comm.*, and *Cherdron Const. Co.* v. *Simpkins*, supra), can it be said that there is any testimony showing an accidental injury? No showing is made that anything out of the ordinary happened to the deceased during the time he was unloading the car. Assuming, without so holding, that the statements to the truckman by Mr. Tullgren as he was being driven home that he had over-exerted himself can be considered to have any probative value, that testimony nevertheless fails to show anything out of the ordinary or any accident or untoward or unexpected thing that happened during the work of unloading the car. No time or place is given which can be seized upon as showing anything unexpected or unusual happening during the course of the work."

What was said by this court in the *Bamberger Coal Co. Case,* supra, is equally applicable to the facts in this case. Both the facts and the principles of law applicable to the two cases cannot well be distinguished. This case, in my opinion, is controlled by the case of *Bamberger Coal Co.,* supra, and therefore the order of the commission should not be disturbed.