## BOYD v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5631.    Decided July 26, 1935.    (48 P. [2d] 498.)

174

*O. H. Matthews,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *Gustin & Richards,* of Salt Lake City, for defendants.

WOLFE, Justice.

Certiorari to the Industrial Commission to review an order denying compensation to the widow and children of Reese Boyd, deceased. On March 30, 1934, and a few days prior thereto, Reese Boyd was working as a carpenter on the building of a bridge for Knowlton & Rupert, who were subject to the Workmen's Compensation Act (Rev. St. 1933, 42-1-1 et seq.). On March 30th, upon returning from work, he complained to his wife that he was ill. He became progressively worse, and on April 8th died. There was direct evidence that he had a bruise on his left shoulder and left arm, discovered by his wife on March 31st. There is no dispute as to the foregoing facts. There was direct evidence that he had helped to carry heavy pipe. Reese told the doctor that the labor foreman, in order to help him, had pushed against his back and the force broke a button on his overalls and bruised his shoulder. He told his wife he got the bruise helping one of the men lift a pipe, and that he balanced it against his shoulder, two or three days before he quit work. This indirect testimony is the only evidence of how and where he got the bruise.

There was direct evidence by his wife that when he came home on the 30th of March he complained of pain in his hands; that she took two or three slivers from his hands; that his hand was infected. This is the only direct evidence that there were slivers in his hand, but there was direct evidence from the doctors that his hands were sore; that they contained angry and infected looking sores. There is also evidence from Parkinson, for whom he worked during the period he was working on the bridge, that he had a bandage

on his left hand and his thumb and finger wrapped up. This was two or three days before March 30th. He told Parkinson that he hurt it on the bridge.

The doctor who attended him was of the opinion that his death was caused by an infection getting into his hands, transferred to the bruised area of the shoulder, and that in this area of weakened resistance it spread over the body. Another doctor who saw him a few hours before his death testified that death was due to some form of streptococcus, either straight erysipelas or straight streptococcus infection, and that it could start from infection caused by slivers in the hand.

The commission found that he died on April 8th from erysipelas of the body; that his death was not directly or indirectly due to an accident arising out of his employment while employed by Knowlton & Rupert, and consequently denied compensation.

The links in the necessary chain of causation from the accident to his death are: (1) Did he have an accident? (2) Did it occur while he was employed by Knowlton & Rupert? And (3) did it cause the death? As to (1) there is observation evidence as to the presence of the bruise and of the slivers. Therefore, there is evidence as to an accident because it may be inferred that the bruise and slivers were caused by an accident. Men do not get bruises or slivers in their hands as incidentally but only as accidentally to their ordinary existence. There is evidence as to (3) ; that is, there is competent opinion evidence on the part of the doctors that death was caused by primary infection starting in his hands which led up to the bruised area in his chest and spread throughout the body. It may be inferred that the infection which started from his hands arose from the slivers because there was sufficient evidence that the sores which were caused by infection were caused by the slivers. As to (2) there is perhaps some circumstantial evidence and, in addition, testimony of the deceased speaking through witnesses who testified as to statements made by him to them.

We avoid at this juncture the use of the word "hearsay" because some of the authorities class certain evidence of that character, i. e., expressions by the person injured showing present pain and suffering, as verbal acts and not hearsay. Other authorities call it hearsay but make it an exception to the hearsay rule. For that reason, until the matter in the declarations is segregated and classified, we shall call it transmitted evidence of such. Certain evidence may be competent. Other evidence of this type is not, depending upon conditions under which it is given and the extent to which it goes, as set out hereafter.

The applicant seems to infer that the reason the commission denied compensation is that it determined that there was nothing but hearsay evidence to support the link of the chain relating to where and when the accident occurred. However, the record itself is silent as to why the commission concluded that "an accident did not occur while the deceased was employed with Knowlton and Rupert." The only intimation that the commission found as above is as contained in one or two expressions by Mr. Knerr, the examining commissioner, during the course of the examination. Mr. Knerr asked the attorney for the applicant, "Have you any witness to the accident?" to which counsel answered, "No," to which the examiner replied, "It appears that all your evidence so far is hearsay unless the death certificate is admitted." Further, at the end of the second hearing the commissioner stated, "The question as I see it, Mr. Mathews, is as to whether the evidence pertaining to the accident is other than hearsay." These are the only indications contained in the record that the commission thought there was no competent evidence of slivers entering the hand while the deceased was working for Knowton & Rupert.

We shall first examine the question as to whether transmitted accounts of how the bruise and slivers came about are competent. If they are competent, then the question will remain as to whether the commission was justified in law in coming to the conclusion that it did in view of all of

the competent evidence. If it is not competent, then the question will remain, Was there any other competent evidence and, if so, can it be said as a matter of law that the commission should necessarily have found for the applicant upon such competent evidence?

Evidence of the accounts by the deceased of how he received the bruise and slivers falls under two heads: (1) Those alleged statements of his made to a doctor; and (2) those made to laymen. They may be divided in another way: (1) Those made in connection with statements regarding pain or complaint as to how he was feeling; and (2) those made purely as a statement unattended or unconnected with a statement as to mental or physical condition or feelings. We refer to the testimony in question by capital letters, as we shall hereafter refer to it by such means to avoid repetition.

(A) Statements by the wife on March 30:

"Q. Did he state how he received the slivers? A. Just working on the job, he said."

The record shows as near as may be that this was at the same time the wife was extracting the slivers after he had complained of pain in his hands.

(B) Conversation with his wife on March 31st:

"Q. Did you have any conversation with him regarding how he got the bruises? A. I asked him he got the bruise. He said he was lifting a pipe helping one of the men lift a pipe, and he balanced it against his shoulder and that in that way he got the bruise. It had been two or three days before."

This conversation does not appear to be in relation to any complaint or to explain how he was feeling, or to have been necessary in any way for her to treat him, but was prompted by her noticing the bruise while he was in bed and her inquiring about it.

(C) The wife testifying on cross-examination:

"Q. Did he say where he got this particular sliver? A. *He said he got it on the job working on the bridge."* (Italics supplied.)

(D) The wife's testimony on the second hearing:

"A. When he came home on Saturday morning, March 31st, is when I noticed a big blue spot on his left shoulder. I asked him how he got it. He said, 'I was helping carry a pipe up there, and that is how I got it.' He said, 'I had lifted it up and had it balanced against my shoulder, and one of the other men kind of pushed back.' He said, 'It was a hard push and it broke a button off my overalls.' "

It does not appear that this statement was made in connection with or as a basis of any treatment or information necessary to make a treatment on the part of the wife, or as an indication of any feeling.

(E) Testimony by Parkinson: He testified he was remodeling a store in Morgan and employed Boyd as a carpenter to tear out old shelving and rebuild it into a counter. It was rough work. He was employed for a couple of hours in the morning before he went to work on the bridge. This was two or three days prior to the time he took sick.

"Q. Do you know whether or not while he was doing that work (work for Parkinson) he was injured? A. No, I don't. I noticed when he first came to work he had some bandages on his left hand and his thumb and finger wrapped up. When he first came to work for me *he said he hurt it on the bridge.*" (Italics supplied.)

Here is a statement made apparently as pure narrative.

(F) Statements to the doctors: Dr. Abbott:

"Q. Did you discover any further injury at any time while you were waiting on him? A. He had several sores on his hands—infected looking sores.

"Q. Did he state to you how he received these sores? A. *He said he got them handling lumber at his work.*" (Italics supplied.)

(G) Dr. Dumke:

"Q. Did you make any examination of Mr. Boyd? A. * * * About the only question I asked him, I noticed multiple scars on both hands and *I asked him how he got these and he said building a bridge.*" (Italics supplied.)

Cross-examination:

"Q. When he told you that he got the slivers from building a bridge he didn't tell you when he got it? A. No, he didn't tell me. He was a very sick man."

We believe this recites all the testimony as to when and where he got the bruise and slivers. In the case of *Hammond* v. *Ind. Comm.*, 84 Utah 67, 34 P. (2d) 687, 693, will be found language which states the general rule regarding declarations which are indexes to pain. These declarations, whether exclamations, ejaculations or descriptive, which indicate or describe then presently existing pain or feelings, are competent evidence wherever the fact or issue of pain or feeling is material and when made to one of the medical profession or the laity. Further, statements made to the attending physician which could aid or reasonably tend to aid in determining the nature of the injury, the nature of its cause, and thus more easily diagnose the case or to discover or interpret symptoms, are admissible. These rest "logically upon the necessity of the case. It is matter proper to be shown, and not susceptible generally of being otherwise proven." See *Shade's Adm'r* v. *Covington-Cincinnati Elevated R., etc., Co.*, 119 Ky. 592, 84 S. W. 733, 27 Ky. Law Rep. 224. But the rule is limited to the necessities of the case. *North American Acc. Ins. Co.* v. *Hill's Adm'x*, 182 Ky. 125, 206 S. W. 170, where it was held that all the physician needed to diagnose was that the patient fell over a grip or the grip fell on the patient, naming the part of the body which came in contact with the grip, together with the symptoms following, and not that while boarding the train the train started up suddenly, throwing him violently, resulting in his falling over the grip or the grip falling on him. The place of the accident, as in the instant case, was the vital issue in that case, for if it happened on the railroad train the policy covered the accident; and if not the policy did not cover the accident. While there may be some question as to whether the fact as to how the acci-

dent happened—the violent projection which comes from the sudden starting of a train—may not have been of value to the physician in getting some idea of the force with which the patient contacted the grip or the grip contacted the patient and thus have aided in the diagnosis, yet the case illustrates the general principal involved. In the *Shade Case,* supra, it was held:

"It was necessary for the physician to know whether the patient was suffering, and where the pain was, and as to its character. It was also proper that he should know how the injury was inflicted, as upon that knowledge his treatment, in part, might depend. So it was competent to show that the patient said she had received a blow on her head, if she did say it, and how she was otherwise hurt. But it was wholly immaterial to the physician's understanding what it was necessary for him to know in treating the injuries whether she fell on appellee's bridge or elsewhere, or that she fell on ice."

It is sometimes difficult to draw the line between that which may be necessary or apt to permit the doctor's conclusions and that which is not competent, or where not, it is so inseparately connected with the description of the injury or its causes or how it happened as to make it necessary. But we are not here concerned with that difficulty.

Taking (A) : His statement to his wife that he received the slivers "working on the job" is not an expression indicative of any pain or feeling nor necessary for her to extract the slivers. Moreover, "the job" may have referred to the Parkinson Job. (B) : The statement ■ as to how the deceased got the bruise, was not to a physician and even if the rule goes so far as to be admissible when made to a lay person, which we need not now decide, it was not necessary for a treatment by the lay person. In the case of (C) above, it was a matter of pure narrative, as is also the case with (D) and with (E). See *Lallier Const. & Engr. Co.* v. *Ind. Comm.,* 91 Colo. 593, 17 P. (2d) 532. (F) was to an attending physician. If it was necessary for a physician to know that a wooden sliver came from handling lumber, it would not be necessary to know at what place.

Moreover, "handling lumber at his work" may have been at either his work at the bridge or at Parkinson's. (G) is the nearest to coming within the rule. The physician noticed "multiple scars on the hand." It was of aid to him to know how the patient received them. He was told it was "building a bridge." Perhaps we might indulge the presumption that the original statement of the patient embodied the statement as to how the scars arose, i. e., from splinters while building a bridge. The fact that a man received a scar while building a bridge would not help the physician. The doctor would want to know what caused the trauma, not what work he was on when it happened unless the work itself was of such a nature that it would throw light upon the manner in which it was caused. Thus, we may presume that the doctor did not rest with a mere useless reply and that he determined that it was caused by slivers while building a bridge and not while just building a bridge. But at all events, the helpful portion of the answer would be regarding the slivers and not where he got them. The fact that he got them from lumber while building a bridge is no more helpful than that he got slivers from lumber any other place, as far as diagnosis is concerned. Perhaps as the original answer was given, the part about the bridge might have been so inseparably incorporated into the rest of the answer as to leave the latter unintelligible without it. As to that we can never know. That is one of the handicaps which any one relying on transmitted testimony labors under. We realize that where a workman gets slivers in his hand of apparently no consequence he is unlikely to report it or mention it at the time or exhibit it so that it would be difficult to prove the cause of infection by direct testimony or even by circumstantial evidence. But it is likewise important that the rule regarding narration be not relaxed so as to open the doors to a flood of incompetent testimony. It must be kept in mind that in all this testimony of transmitted expressions, the deceased is permitted to speak through the mouth of another. Statements become altered and lose the virility of their orig-

inal content. The original sayer cannot be cross-examined. It would be dangerous and work great injustice if the rule were relaxed.

In the Hammond Case, supra, it was said:

"The statement that the work was done at a particular reservoir or place in City Creek Canyon operated or controlled by the city may be open to objection, and may properly be excluded."

The extraneous matter suggested as being subject to exclusion in that case is on all fours with the extraneous matter which was a part of the deceased's declarations in regard to which testimony was given in this case.

In *Z. C. M. I.* v. *Ind. Comm.*, 70 Utah 549, 262 P. 99, 100, we have a case where the only evidence of where an alleged pin prick took place was by statements made by the deceased that he had pricked his finger while at work with his employer. The court said:

"The evidence of the accident was all hearsay. None of the statements testified to were made at such time or place or under such circumstances as to make proof of them competent as part of the res gestae. All were mere narratives of a past event, unconnected with the event itself, with no element of spontaneity."

The case of *Roosa* v. *Boston Loan Company*, 132 Mass. 439, cited by the plaintiff, is distinctly against her. There the court held that the physician could not testify as to the cause as narrated by plaintiff to him. In that case the court held he could not testify that she had told him that she received a severe blow in the stomach. We submit the rule is not as narrow as laid down in that case decided in 1882. The case of *United States* v. *Tyrakowski* (C. C. A.) 50 F. (2d) 766, cited by plaintiff is not in point.

The case at bar, therefore, stands thus: All the transmitted evidence was incompetent. Was there any additional evidence to show where the accident occurred? If so, was the commission in law bound to hold it as satisfactory proof,

there being nothing to the contrary and the record not intrinsically showing its unreliability? The fact ■ that the deceased came home with slivers in his hand from a job where he was handling lumber might in itself be some circumstantial evidence that the slivers came from the lumber he handled on the job, where the opportunity to obtain such slivers otherwise was negatived. *Zimmerman* v. *Goodfellow Lumber Co.* (Mo. App.) 56 S. W. (2d) 608. The difficulty in this case is that there was not only no negation of other opportunities, but a situation is shown from which it could be inferred that the slivers might have come from another job. Even the circumstantial evidence would lead to a speculation regarding which lumber, the Parkinson or the Knowlton & Rupert lumber, the slivers came from. The case is not such therefore, as to require us to say that as a matter of law the commission should have determined this issue in favor of the plaintiff.

The order of the Industrial Commission denying compensation is affirmed.

ELIAS HANSEN, C. J., and FOLLAND, J., concur.

MOFFAT and EPHRAIM HANSON, JJ., concur in the results.